IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 61550323884721 THAT IS STORED AT A PREMISES CONTROLLED BY META PLATFORMS INC. | MJ- 23-242- N<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, DAKOTA S. PARKER, being first duly sworn, hereby depose, and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2. I am a federal Task Force Officer ("TFO"), deputized by the Federal Bureau of Investigation ("FBI") and currently employed by the Baldwin County Sheriff's Office ("BCSO"). I have been a TFO since September 2023, and a law enforcement officer since August 2014. My formal education includes a Bachelor of Science Degree in Interdisciplinary Studies with concentrations in Criminal Justice and Business from the University of South Alabama. From August 2014 to the present, I have attended multiple formalized training courses pertaining to

1

criminal investigations, during which I learned the fundamentals of how to conduct such investigations.

3. I am currently assigned to the FBI in the Mobile Division and charged with investigating crimes violating federal law, to include, but not limited to: violent crimes, narcotics trafficking, public corruption, civil rights violations, health care fraud, and financial crimes into and through the Southern District of Alabama. As the nature of my ongoing work at the FBI requires that I keep abreast of recent trends and developments involved in the investigation of the above listed crimes and organizations involved in those crimes, I consistently communicate with agents from the FBI, Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), and various other local law enforcement officers operating within the Southern District of Alabama.

4. While employed with BCSO I have been assigned to the BCSO Drug Task Force for more than three years beginning in January of 2020. During this time, I have been involved in numerous controlled substance-related investigations involving various illegal substances including heroin, cocaine, methamphetamine, and marijuana. By virtue of my involvement with those investigations I have performed or been trained in various tasks, which include, but are not limited to: conducting surveillance, interviewing witnesses, managing cooperating individuals and informants, functioning as a case agent, and collecting and reviewing electronic evidence.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, witnesses, and others associated with this investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge concerning

this matter. All dates, times, locations, and amounts referenced in this affidavit are my approximations.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841 (a)(1) (conspiracy and possession with intent to distribute controlled substances) and 924(c)(1) (possession of firearms in furtherance of drug-trafficking crimes) have been committed, or are being committed by GORDON JAY WYMAN III ("WYMAN"), and other persons, known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

7. While exercising my duties as a TFO with the FBI, I have become involved in an investigation concerning the distribution of illicit pills containing fentanyl by WYMAN in the Mobile, Alabama area. This investigation was initiated after information was obtained from a confidential human source ("CHS"). The CHS is deemed reliable in that the CHS has previously provided information that was independently verified as true and resulted in the controlled purchase of narcotics on no less than three occasions. The CHS is cooperating with law enforcement agents in exchange for favorable consideration in on-going criminal matters as well as monetary consideration. The CHS is familiar with the appearance of controlled substances, the way they are sold, transported, and used in that the CHS has sold, transported, and used controlled substances in the past.

8. During the month of September 2023, the CHS advised that he/she had knowledge of a subject known as "Jay," who was distributing narcotics within the Mobile, Alabama area. The CHS advised that he/she had seen "Jay" in possession of a handgun while also in possession of a

3

bag that was estimated to contain over 100 illicit pills. The CHS advised that "Jay" is a known narcotics distributor in the Mobile, Alabama area and is also a known gang affiliate. "Jay" was identified utilizing investigatory means as WYMAN. This identification was corroborated by the CHS during the month of September 2023. During the same month, the CHS communicated with the operator of the Facebook ID **61550323884721** to set up the purchase of illicit pills containing fentanyl.

9. The operator of the Facebook ID **61550323884721** has been identified by the CHS as WYMAN and has been confirmed by information received from CHS as:

Name: Jay Wyman

Social Media: https://www.facebook.com/profile.php?id=61550323884721

10. On September 21, 2023, the CHS met agents at a safe location in Mobile, Alabama. The CHS had orchestrated a transaction for 200 illicit pills from WYMAN, in exchange for approximately seven hundred dollars in United States currency by communicating with him on the Facebook messenger application. The Facebook messenger application was utilized for both calls and messages between the CHS and WYMAN in order to determine price, amounts, times and meeting locations. During this communication WYMAN utilized the account with Facebook ID **61550323884721**.

11. Prior to the transaction, the CHS was provided United States currency and instructions to complete the aforementioned transaction. The CHS then traveled to an undisclosed residence area in Mobile, Alabama and met with WYMAN and numerous other unknown associates. During this transaction, WYMAN provided the CHS with approximately 200 illicit pills in exchange for approximately seven hundred dollars of United States currency. During the transaction, the CHS was in possession of electronic recording equipment that enabled officers

4

and agents to monitor and record the event, he/she was also followed to and from the transaction location by officers and agents and did not stop at any other locations before meeting WYMAN. Prior to and after the transaction, the CHS's vehicle and person was searched, revealing no contraband or monies not provided by, or purchased on behalf of law enforcement. The CHS advised that he/she obtained the illicit pills from WYMAN after the conclusion of the transaction, but that another individual was involved in the transfer of the narcotics. The pills from this transaction were field tested using a presumptive test kit and yielded a positive result as containing fentanyl. This exhibit was sent to the DEA lab for further/official analysis.

12. On September 28, 2023, the CHS met agents at a safe location in Mobile, Alabama. The CHS had orchestrated a transaction for 200 illicit pills from WYMAN, in exchange for approximately seven hundred dollars in United States currency by communicating with him on the Facebook application. The Facebook messenger application was utilized for both calls and messages between the CHS and WYMAN in order to determine price, amounts, times, and meeting locations. During this communication, WYMAN utilized the account with. Facebook ID **61550323884721**.

13. Prior to the transaction, the CHS was provided United States currency and instructions to complete the aforementioned transaction. The CHS then traveled to an undisclosed parking area in Mobile, Alabama and met with WYMAN and numerous other unknown associates. During this transaction, WYMAN advised the CHS that he was in possession of a handgun. WYMAN then provided the CHS with approximately 200 illicit pills in exchange for approximately seven hundred dollars of United States currency. During the transaction, the CHS was in possession of electronic recording equipment that enabled officers and agents to monitor and record the event, he/she was also followed to and from the transaction location by officers and

agents and did not stop at any other locations before meeting WYMAN. Prior to and after the transaction, the CHS's vehicle and person was searched, revealing no contraband or monies not provided by, or purchased on behalf of law enforcement. The CHS advised that he/she obtained the illicit pills from WYMAN after the conclusion of the transaction, but that another individual was involved in the transfer of the narcotics. The pills from this transaction were field tested using a presumptive test kit and yielded a positive result as containing fentanyl. This exhibit was sent to the DEA lab for further/official analysis.

14. Based on my training, experience, and what I have learned from other law enforcement professionals, the affiant submits there is probable cause to believe evidence and instrumentalities of the crimes of violations of 21 U.S.C. §§ 846 and 841 (a)(1) (conspiracy and possession with intent to distribute controlled substances) and 924(c)(1) (possession of firearms in furtherance of drug-trafficking crimes) are believed to be contained within the Facebook account sought by this warrant, to include, but not limited to, messages, comments, videos, photographs, calls, and private messages.

## TECHNICAL BACKGROUND ON FACEBOOK[1]

15. Meta owns and operates Facebook, a free access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share communication,

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

6

news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16. Meta asks Facebook users to provide basic contact and personal identifying information, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

17. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed" which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

18. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

7

19. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

21. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and

Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

24. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

27. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

28. Meta also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on

9

Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

29.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can

show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Meta builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

31. Therefore, the computers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## RELEVANT CRIMINAL STATUTES

32. The following criminal statutes are relevant to this investigation:

   a. *Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a)(1):* It shall be unlawful for any person knowingly or intentionally—

> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . .

b. *Attempt and Conspiracy, in violation of 21 U.S.C. § 846:* Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

c. *Possession of a Firearm in Furtherance of a Drug-Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1):* . . . any person who, during and in relation to any crime off violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the Untied States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . .

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

33. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

34. Based on the foregoing, I request that the Court issue the proposed search warrant.

35. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by

serving it on Meta. As the records sought by this warrant are already in the possession of law enforcement, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

36. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### REQUEST FOR SEALING

37. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Dakota Parker
Task Force Officer
Federal Bureau of Investigation

THE ABOVE AGENT HAS ATTESTED TO THIS AFFIDAVIT PURSUANT TO FED. R. CRIM. P. 4.1(b)(2)(A) THIS _____ DAY OF OCTOBER 11, 2023

KATHERINE P NELSON
UNITED STATES MAGISTRATE JUDGE

1:30pm

13